| | |
|---|---|
| KATHLEEN LYONS, TORI SMITH, AND VALERIE NECCI individually and as representatives of a class of similarly situated persons, on behalf of the VANDERBILT UNIVERSITY MEDICAL CENTER RETIREMENT PLAN<br>Plaintiffs,<br>v.<br><br>VANDERBILT UNIVERSITY MEDICAL CENTER, VANDERBILT UNIVERSITY RETIREMENT PLAN OVERSIGHT COMMITTEE, VANDERBILT UNIVERSITY MEDICAL CENTER BOARD OF TRUSTEES, and VANDERBILT UNIVERSITY MEDICAL CENTER BOARD OF DIRECTORS, and DOES No. 1-10, Whose Names Are Currently Unknown,<br><br>Defendants. | Case No.:<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

### I.     INTRODUCTION

1.     Plaintiffs Kathleen Lyons, Tori Smith, and Valerie Necci ("Plaintiffs"), individually and on behalf of the Vanderbilt University Medical Center Retirement Plan ("VUMCRP") (the "Plan") and a proposed class ("Class") of participants in and beneficiaries of the Plan, bring this action ("Action") under 29 U.S.C. § 1132 against Defendants Vanderbilt University Medical Center ("VUMC"), the Vanderbilt University Retirement Plan Oversight Committee (the "Committee"), the Vanderbilt University Medical Center Board of Trustees ("Trustees"), the Vanderbilt University Medical Center Board of Directors (the "Board"), and

1

DOES No. 1-10, who are current or former members of the Board, Trustees, or Committee or are otherwise fiduciaries of the Plan whose names are currently unknown (collectively, "Defendants"), for breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related breaches of applicable law beginning six years prior to the date this Action is filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just (hereinafter, the "Class Period").

2.       As employer-provided defined benefit plans have become increasingly rare as a meaningful benefit offered and available to employees of private companies and universities, defined contribution plans (*e.g.*, 403(b) plans) qualified as pre-tax vehicles have become the primary form of retirement saving in the United States and, as a result, the country's *de facto* retirement system. In traditional defined benefit retirement plans, a sponsoring employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, since such an employer is responsible for any shortfall in funding to provide the benefits promised. In the context of defined contribution plans, however, *participants* bear the risk of high fees and investment underperformance.

3.       As of the end of 2024, the Plan had 74,386 participants with account balances and assets totaling more than $4.7 billion. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand low-cost administrative and investment management services within the marketplace.[1] The market for defined contribution retirement plan services is well-established and can be competitive when fiduciaries act in an informed and prudent manner.

---

[1]       *See*,       https://www.myplaniq.com/invest/planinfo/vanderbilt-university-medical-center-retirement-plan (last visited March 17, 2026)

2

4. Defendants maintain the Plan. Defendants are responsible for selecting, monitoring, and retaining the service providers that provide investment, recordkeeping, and other administrative services. Defendants are fiduciaries under ERISA, and, as such, owe several well-defined duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, select and maintain prudent and diverse investment options to offer through the Plan (including review and removal of historically poor performing funds), and ensure that expenses paid by the Plan are fair and reasonable in relation to the services obtained.

5. Defendants breached their fiduciary duties to the Plan. As detailed below, Defendants failed to appropriately monitor the Plan's investments, resulting in the retention of unsuitable investments in the Plan instead of prudent alternative investments that were readily available at all times. Defendants selected and retained the funds at issue and throughout the Class Period.

6. The fund at issue is the Vanguard Dividend Growth Fund Investor Shares ("VDIGX" or "Vanguard Fund" or "Imprudent Fund"). Since Defendants have the discretion to select the investments made available to participants, Defendants' breaches directly caused the alleged losses herein.

7. To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed Class as the Court may deem appropriate and just under the circumstances.

8. Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

3

(1) A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

(2) A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and Plan participants and beneficiaries;

(3) Equitable, legal, or remedial relief for all losses and/or compensatory damages;

(4) Attorneys' fees, costs, and other recoverable expenses of litigation; and

(5) Such other legal or equitable relief as the Court deems appropriate and just under the circumstances.

## II.     THE PARTIES

9.      Plaintiff Kathleen Lyons ("Lyons") was an employee of Vanderbilt University Medical Center and a participant in the Plan under 29 U.S.C. § 1002(7). Bogenschild is a resident of Madison, Tennessee. During the Class Period, Lyons maintained an investment through the Plan in the Imprudent Fund.

10.     Plaintiff Tori Smith ("Smith") is an employee of Vanderbilt University Medical Center and a participant in the Plan under 29 U.S.C. § 1002(7). Smith is a resident of Greensboro, North Carolina. During the Class Period, Smith maintained an investment through the Plan in the Imprudent Fund.

11.     Plaintiff Valerie Necci ("Necci") was an employee of Vanderbilt University Medical Center and a participant in the Plan under 29 U.S.C. § 1002(7). Necci is a resident of Greenbrier, Tennessee. During the Class Period, Necci maintained an investment through the Plan in the Imprudent Fund.

4

12. Defendant Vanderbilt University Medical Center is a non-profit corporation located in Nashville, TN. Vanderbilt University and Vanderbilt University Medical Center became separate non-profit entities in 2016. They operate under an Academic Affiliation Agreement and as part of this agreement, Vanderbilt University faculty may be employed by VUMC and subject to the University's oversight. VUMC is "the largest non—governmental employer of Middle Tennesseans, with nearly 40,000 staff, including more than 3,000 physicians, advanced practice nurses and scientists appointed to the Vanderbilt University faculty."[2]

13. Defendant Vanderbilt University Retirement Plan Oversight Committee "serves in a fiduciary role by overseeing the core investment options in tiers 1 and 2 and managing the plan in the best interests of participants."[3] The Committee is responsible for the general administration of the Plan and is a fiduciary under ERISA, 29 U.S.C. §§ 1002, 1102. The Committee maintains its address at Vanderbilt University, PMB 407704, 2301 Vanderbilt Place, Nashville, Tennessee 37240-7704. The Committee and its members are appointed by the Board, the Trustees, or their delegate to administer the Plan on Vanderbilt University Medical Center's behalf.[4]

14. Defendant Medical Center Board of Trustees—including Does No. 1-5, who are current and former members of the Board of Trustees— are fiduciaries of the Plan under ERISA, 29 U.S.C. §§ 1002(21)(A), because they determine "the Plan's valuation policies utilizing information provided by the investment advisers, investment providers, and insurance

---

[2] https://news.vumc.org/vumc-facts-and-statistics/
[3] *See Fiduciary*, Glossary, Retirement Plan for Faculty and Staff, Vanderbilt University, https://hr.vanderbilt.edu/benefits/retirement/glossary.php (last visited Feb. 13, 2026).
[4] *See* Vanderbilt University Medical Center Retirement Plan Notes to Financial Statements, Form 5500 (Dec. 31, 2024), *available at* https://www.efast.dol.gov/5500Search/ (last visited March, 17, 2026).

5

companies."[5] DOES No. 1-5 are current and former members of the Board and, by virtue of their membership or otherwise, are fiduciaries of the Plan.

15.     Defendant Vanderbilt University Medical Center Board of Directors—including Does No. 6-10, who are current and former members of the Board—are fiduciaries of the Plan under ERISA, 29 U.S.C. §§ 1002(21)(A), because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over the Plan's management and/or authority or control over management or disposition of the Plan's assets. DOES No. 6-10 are current and former members of the Board and, by virtue of their membership or otherwise, are fiduciaries of the Plan.

16.     Plaintiffs are currently unable to determine the membership of the Board and Committee or the identities of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Board and Committee or the identities of any other fiduciaries are not publicly available. As such, these Defendants are named as DOES 1-10 as placeholders. As soon as practicable after their identities are discovered, Plaintiffs will move under Federal Rule of Civil Procedure 15 to amend this Class Action Complaint ("Complaint") to name the members of the Board, members of the Committee, and other responsible individuals as Defendants.

### III.     JURISDICTION AND VENUE

17.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. §§ 1109 and 1132.

---

[5] *Id*.

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

19. This Court has personal jurisdiction over Defendants because Defendants reside in this District, many of the acts and transactions giving rise to the action occurred in this District, and because Defendants conduct substantial business by operating its principal place of business in this District.

20. Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Vanderbilt University Medical Center's principal place of business is in this District and the Plan is administered in this District. Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

21. Plaintiffs have standing to bring the Action because assets attributable to their accounts in the Plan were invested in the unsuitable and/or imprudent investment alternatives retained by Defendants during the Class Period and at issue in the Action. As explained herein, the Plan has suffered millions of dollars in losses due to Defendants' fiduciary breaches and remains vulnerable to ongoing harm, which is redressable by the Court. Further, Plaintiffs and Plan participants also suffered financial harm as a result of Defendants' retention of unsuitable and imprudent investment options, among other injuries.

## IV.    DEFENDANTS' FIDUCIARY OBLIGATIONS

22. ERISA imposes strict fiduciary duties of prudence and loyalty on Defendants as fiduciaries of the Plan.

23. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B); *see also Johnson v. Parker-*

7

*Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024). Accordingly, fiduciaries must vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor.

24.     As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, plan administrators "must dispose of it within a reasonable time." *Id*. (citation omitted).

25.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024) (citing *Chao*, 285 F.3d at 426). The retention of unsuitable investments in a retirement plan implicates both duties. As was the case here, the failure to react to real-time indicia that an investment is unsuitable for a plan is imprudent. The ultimate selection or retention of such an investment, however, is also disloyal as it subordinates the interests of plan participants to those of other parties, including the managers of the investments at issue who collect management fees and otherwise benefit from a plan's assets being invested in the funds.

26.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that: In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary,

8

knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

27.     Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V.     FACTUAL ALLEGATIONS

### A.  BACKGROUND AND STRUCTURE OF THE PLAN

28.     The Plan is a participant-directed defined contribution plan, meaning participants direct the investment of their contributions into various investment options offered under the Plan. Each participant's account is credited with their contributions, applicable employer matching contributions, and discretionary contributions, and earnings or losses thereon. The Plan pays expenses from assets in the Plan, and the majority of administrative expenses are paid by participants as a reduction of investment income.

29.     Defendants select the investment options made available to Plan participants including, the Imprudent Fund—the Vanguard Dividend Growth Fund or "VDIGX."

9

### B. DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

#### a. THE STANDARD FOR SELECTING A PRUDENT INVESTMENT

30.     The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant index or indices.[6] It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns for that investment to be rational. This principle applies even before considering the purpose of the investment or the needs of an investor. The Capital Asset Pricing Model ("CAPM")—which is a well-established model used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following mathematical formula for this principle:

$$ERi = Rf + \beta i(Erm - Rf), \text{ where:}$$

$ERi$ = the expected return of the investment

$Rf$ = the risk-free rate

$\beta i$ = the beta of the investment

$(Erm - Rf)$ = the market risk premium

31.     Applied here the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—$ERi$—is, at the very least, above that of its benchmark, $Rf$.[7] Otherwise, the model collapses, and it would economically be irrational to assume the extra risk without achieving a higher return than the benchmark.

---

[6] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC, February 16, 2023, https://smartasset.com/financial-advisor/active-management (last visited Feb. 13, 2026) ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers").

[7] In this instance, the benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category or its stated benchmark, rather than

32.     In other words, CAPM specifically contemplates the comparison of an investment to an applicable industry benchmark and, thus, a prudent process necessarily includes benchmark index comparison.

33.     Prudent fiduciaries compare actively managed funds to other actively managed funds and to passively managed funds or similar indices in order to determine whether a plan is getting the additional return to justify the increased expense and risk of the active investment. This, in addition to other metrics (such as relative performance), is exactly what every competent investment professional does to evaluate an actively managed investment. In promulgating its final rule to "Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans" in February 2012, the Department of Labor ("DOL") specifically required that plan sponsors identify benchmarks in the form of an appropriate broad-based securities market index for each investment offered in a plan, thus specifically recognizing that actively managed investments must be evaluated against indexes.[8] Performing such an analysis is not only intended to determine whether a plan would be better served by a passively managed investment, but also whether an actively managed fund is providing value sufficient to justify its retention.

34.     Market research indicates that investors should be skeptical of certain actively managed funds' ability to consistently outperform their indices (or stated benchmarks), which is a significant concern for long-term investors saving for retirement, like Plan participants. Morningstar, a respected source of investment information, has repeatedly concluded that "in

---

the typical U.S. Treasury bonds or equivalent government security in a general CAPM calculation. The Arbitrage Pricing Theory ("APT") likewise dictates the same result.

[8] Fact Sheet, Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans, U.S. Dept. Lab. (Feb. 2012), http://dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/dol-transparent-401k-fees-fact-sheet.pdf (last visited Feb. 13, 2026).

11

general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[9] Although they may experience success over shorter periods, active fund managers are infrequently able to time their activity efficiently enough to outperform the market. This is not to suggest that active management is inappropriate for use in a retirement plan lineup, but that plan fiduciaries must carefully analyze each active funds' ability to provide value and, if they deem a fund does not, replace it with an active or passive fund that has demonstrated such capabilities.

35. To be clear, Plaintiffs do not challenge the selection of actively managed investments and do not challenge active management specifically or in general. As explained above, there is nothing inherently wrong with choosing actively managed funds, as long as the expected return of the fund justifies the increased expense and risk, as compared to other readily available investment options. In other words, to justify choosing an actively managed investment, fiduciaries of a retirement plan must, at a minimum, engage in rational economic decision-making to justify the more expensive and inherently riskier investment. Since the Defendants here employed either no process, or a fundamentally irrational decision-making process, they breached their fiduciary duties under ERISA, which are the "highest known to law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (citations omitted).

36. In this environment, prudent fiduciaries scrutinize investment managers to determine whether an active manager has presented an ability to exploit inefficiencies in their chosen sector of the market. To do so, and to distinguish between a skilled manager and a lucky

---

[9] Ben Johnson, *Actively Managed Funds Continue to Underperform*, MorningStar (Feb. 23, 2022), https://www.morningstar.com/funds/actively-managed-funds-continue-underperform (last visited Feb. 13, 2026) ("Only one out of every four active funds topped the average of their passive rivals over the 10-year period ended June 2022.").

12

one, fiduciaries judge fund performance against both an appropriate index benchmark and a universe of similar funds over periods most closely approximating a market cycle—namely, three- and five-year intervals. These time horizons are emphasized by virtually all competent investment professionals as sufficient to gauge a fund manager's ability to execute their strategy. In addition, these two specific time horizons (three- and five-year trailing performance) are the specific time frames that almost all investment policy statements identify as the most important to review in connection with defined contribution investments.[10]

37.     A prudent investment monitoring process will regularly review fund performance against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods, as well as several preceding three- and five-year periods, in order to discern any pattern of underperformance. Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and/or the return of its peers, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.

38.     Index comparisons are particularly important in the efficient U.S. large-cap space. As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those of funds that simply track the

---

[10] Although it may be tempting to somewhat simplistically suggest that 10-year performance, for example, is more important since the plan at issue are retirement plan intended for the long term, such a suggestion is at odds with prevailing practices for several important reasons: (1) waiting for 10 years to determine whether the performance of an investment is acceptable is simply too long because losses that can accrue over such a prolonged period can be devastating to an investor and are almost always unrecoverable given the resulting deficits and impact of compounding; (2) in light of labor market flexibility in the United States (with the average employee holding a position for slightly more than four years, *i.e.*, between three and five years), the average participant does not remain invested in the same 401(k) plan or retirement instruments for as long as 10 years, *see* Department of Labor, Bureau of Labor Statistics News Release: Employee Tenure in 2022 (September 26, 2024), https://www.bls.gov/news.release/pdf/tenure.pdf; and (3) the average market cycle is less than 10 years and, therefore, as a matter of investment theory and management, it is not the most important or meaningful benchmark with respect to performance.

13

benchmark. The domestic large-cap market is particularly difficult—Morningstar concluded in its year-end 2018 report on active versus passive management that long-term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among U.S. large-cap funds. Accordingly, prudent fiduciaries are particularly concerned with actively managed funds' ability to add value beyond the benchmark, particularly for domestic large-cap strategies.

### 1. DEFENDANTS' IMPRUDENT SELECTION AND RETENTION OF THE VANGUARD DIVIDEND GROWTH FUND – VDIGX

39. The Vanguard Dividend Growth Fund is an investment fund selected by the Plan's fiduciaries and included in the Plan's Core Funds, which opened for investment in May 1992. VDIGX's strategy is to invest primarily in stocks that tend to offer current dividends, focusing on companies that have prospects for long-term total returns as a result of their ability to grow earnings and their willingness to increase dividends over time. Implementing this strategy, the stocks typically—but not always—will be large-cap and show potential to increase dividends across diverse industry sectors. VDIGX is classified in the Large Blend category, and the publicly available fact sheet identifies the Dividend Growth Spliced Index as the benchmark. The Summary Prospectus provided by Vanguard states that the benchmark of the Dividend Growth Spliced Index reflects the performance of the NASDAQ US Dividend Achievers Select Index through September 19, 2021, and the S&P U.S. Dividend Growers Index thereafter, making both indices relevant benchmarks as well as the Dividend Growth Spliced Index.[11]

---

[11]    Vanguard    Dividend    Growth    Fund    Investor    Shares,    Fidelity, https://nb.fidelity.com/public/workplacefunds/summary/OMCF?fundId=OMCF&planId=59208 (last visited Feb. 13, 2026).

40. Defendants maintained VDIGX as an investment option despite an inability to support an expectation of performance sufficient to justify its retention, as evidenced by its consistent and significant underperformance relative to its benchmark(s) (representing a failure to meet the fund's own articulated investment objectives) and peer strategies. However, due to the Committee's deficient investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or a general attitude of neglect towards the Plan, Defendants failed to appropriately monitor, and ultimately replace, the investment option. The performance data below represents information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries.[12]

41. By the start of the Class Period, despite the fund's professed target of outperforming its benchmark over a market cycle, as of December 31, 2020, its five-year average annual return trailed the NASDAQ US Dividend Achievers Select Index benchmark by 1.49% before accounting for taxes. Furthermore, the fund, as of December 31, 2020, trailed its other benchmark at that time, the Dow Jones U.S. Total Stock Market Float Adjusted Index, by 1.83% before accounting for taxes.[13] In short, the fund consistently lagged behind its benchmarks.

42. A fiduciary prudently monitoring VDIGX, which consistently underperformed its benchmarks, would be cognizant of Morningstar's aforementioned conclusion that domestic large-cap funds struggle to achieve long term success over the benchmark(s) and, in concert with the

---

[12] Performance data for the Plan's investments is publicly available. The returns information furnished to participants utilizes quarterly, year-end annual, five-year, and ten-year periods. The data available is sufficient to suggest to any prudent fiduciary that the investments at issue were unable to support an expectation of performance sufficient to justify their retention. To reiterate, three- and five-year periods are widely accepted as the closest proxy for a market cycle and are, thus, sufficient to evaluate a fund manager's skill in executing their strategy.

[13] See Vanguard Dividend Growth Summary Prospectus, Vanguard (May 28, 2021), https://www.sec.gov/Archives/edgar/data/734383/000168386321003795/f9154d1.htm (last visited Feb. 15, 2025).

15

fund's stated intention to generate returns that exceeded the benchmark, would have recognized the fund's performance shortcomings and sought to investigate whether the underperformance was likely to abate. The prevailing standard of care for investment monitoring demands awareness and consideration of rolling performance to identify trends of underperformance. Underperformance over a three- or five-year period is a cause for concern and scrutiny and can itself be reason enough to remove an investment from a plan. In any event, prudent fiduciaries will seek to understand the reasons for the underperformance and closely monitor the investment to see if it subsequently outperforms.[14] Underperformance over several consecutive three- or five-year trailing periods is a cause for both alarm and action by a prudent fiduciary.

43.     VDIGX's underperformance relative to the market segment in which it operates, represented by its stated benchmarks, as well as similar strategies operating in that same market segment, persisted over time. The fund's repeated failure to generate long-term returns that exceeded its benchmark(s) should have been sufficient to convince a fiduciary that was prudently monitoring its performance to not select and/or remove the troubled investment. The fact the fund was selected and continually retained by the Committee, in the Plan's Core Funds no less, despite persistently demonstrating shortcomings and regularly failing to exceed the returns of its peers and benchmarks, represents a severe breach of fiduciary duty.

44.     The worrying signs associated with VDIGX's performance were apparent when the fund was selected and continued as an option for Plan participants from the start of the Class Period, indicating the Committee failed to recognize and/or act to remove the flailing investment. As illustrated in the chart below, per the data available to Plaintiffs, VDIGX has failed to produce

---

[14] "Improved" or lessening underperformance over time is still just that—underperformance. A fund manager that persistently fails to outperform the fund's benchmarks or its peers, however great or slight the underperformance, persistently fails to add value.

a five-year return to beat the benchmark—the fund's stated goal. By December 31, 2020, its five-year average annual return trailed that of the benchmark by 1.49%.

45.     As of Q4 2025, the fund's five-year average annual return trailed the benchmark by 2.67%. As a result, a prudent fiduciary monitoring the fund's consistent underperformance would have recognized the fund's performance shortcomings and investigated whether the performance was likely to abate, and when it did not, would have removed the fund from the Plan's Core Funds and other Plan options.[15]

46.     On a ten-year basis, VDIGX also continuously underperformed its peers and benchmarks. As of Q4 2025, the fund's ten-year average annual return trailed the benchmark by 2.08%.

47.     Notably, the only year the fund "outperformed" its benchmark and peers, 2022, that calendar year it merely *lost less* than the benchmark and still failed to provide a positive return. The fund has never meaningfully outgained its peers, category median, or benchmark.[16]

---

[15] For 2020-September 2021, the benchmark is the NASDAQ US Dividend Achievers Select Index, and the S&P U.S. Dividend Growers Index thereafter.
[16] *See* Exhibit A.

**Figure 1**

| Five-Year Average Annual Returns – VDIGX vs. Benchmark and Peers | | | | | | |
|---|---|---|---|---|---|---|
| **As of** | **VDIGX** | **Benchmark** | **Benchmark Performance** | **Beat Benchmark** | **Peer Performance[17]** | **Beat Peers** |
| YE 2020 | 13.53% | NASDAQ US Dividends | 15.02% | No | 14.62% | No |
| YE 2021 | 16.97% | Dividend Growth Spliced Index | 17.34% | No | 17.72% | No |
| YE 2022 | 11.79% | Dividend Growth Spliced Index | 10.43% | Yes | 10.52% | Yes |
| YE 2023 | 13.50% | Dividend Growth Spliced Index | 13.92% | No | 15.27% | No |
| YE 2024 | 9.42% | Dividend Growth Spliced Index | 11.61% | No | 13.14% | No |
| YE 2025 | 8.67% | Dividend Growth Spliced Index | 11.34% | No | 12.47% | No |

---

[17] Peer performance was determined as follows: for each year from 2020 to 2025, the 5-year trailing average return for each peer fund, listed in Exhibit A, was determined and then averaged across all peers to create an annual peer benchmark. This annual peer average was compared to the VDIGX fund's corresponding 5-year trailing average return.

**Figure 2**

| Ten-Year Average Annual Returns – VDIGX vs. Benchmark and Peers | | | | | | |
|---|---|---|---|---|---|---|
| **As of** | **VDIGX** | **Benchmark** | **Benchmark Performance** | **Beat Benchmark** | **Peer Performance** | **Beat Peers** |
| YE 2020 | 13.15% | NASDAQ US Dividends | 12.79% | Yes | 13.34% | No |
| YE 2021 | 14.65% | Dividend Growth Spliced Index | 14.52% | Yes | 15.71% | No |
| YE 2022 | 12.96% | Dividend Growth Spliced Index | 12.10% | Yes | 12.55% | Yes |
| YE 2023 | 10.76% | Dividend Growth Spliced Index | 10.77% | No | 11.37% | No |
| YE 2024 | 10.48% | Dividend Growth Spliced Index | 11.45% | No | 11.98% | No |
| YE 2025 | 11.08% | Dividend Growth Spliced Index | 13.16% | No | 13.35% | No |

48. On a calendar-year basis, VDIGX also consistently underperformed its peers. As demonstrated in **Exhibit A** to the Complaint, year-after-year VDIGX has failed to match the performance of its peers and relevant benchmark on an annual and three-year trailing basis.

49. The four peers selected for this analysis are meaningful benchmarks to measure VDIGX's underperformance: J.P. Morgan U.S. Large Cap Core Plus I (JLPSX); Hartford Stock HLS Fund Class IA (HSTAX); T. Rowe Price Dividend Growth Fund (PRDGX); Voya Growth and Income Port I (IIVGX).

50. All the peer funds are actively managed mutual funds in the Large Blend Morningstar category. Each of the peer funds has almost one hundred percent of its assets in equities and over ninety percent of those equities in U.S. markets. The peer funds follow a similar strategy as VDIGX with a focus on large cap U.S. equities. For example, as of December 31, 2025, each of the peer funds, and VDIGX, had in their top 10 holdings Microsoft Corp, Apple Inc, and Broadcom Inc. In fact, Vanguard itself gave HSTAX and PRDGX a "Similarity Score" of 1.00 and .97, respectively, explaining that "[t]he Similarity Score is calculated by Vanguard using a proprietary model that is designed to help clients objectively identify product options for analysis and comparison."[18] Given the similarity in style, asset allocation, and strategy the peer funds and meaningful benchmarks to measure VDIGX's consistent underperformance.

51. Had Defendants engaged in an appropriate ongoing review of the VDIGX fund, they would have been aware of the fund's performance shortcomings and its persistent inability to beat the peer median, category median, and benchmark(s), which stretched back several years and

---

[18] *See* Fund Comparison Tool, Vanguard, https://advisors.vanguard.com/investments/portfolio-construction-tools/compare-products/ (last visited Feb. 15, 2026). This comparison tool generates a report comparing the Imprudent Fund to the Peer Funds (last generated Feb. 16, 2026).

20

would have been readily apparent. The fund's performance over the last three-year cycle is particularly abysmal. The recent trends represented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the VDIGX fund, as sustained underperformance is the clearest indication of an actively managed fund's inability to provide value. However, Defendants ignored or were otherwise unaware of the troubling pattern of rolling returns, failed to investigate a replacement for the VDIGX fund, and allowed it to linger in the Plan even as its underperformance issues persisted.

52. As is clearly exhibited by the consistently weak performance shown in the charts above, the VDIGX fund has never been an appropriate investment option for the Plan during the Class Period. It continues to underperform the benchmark(s), peer, and category medians: as of December 31, 2025, the VDIGX fund's five-year returns trailed those of its benchmark by 2.67% on an average annual basis and those of the peers by 3.8%. The fund's ten-year returns similarly lag the relevant index by 2.08% on an average annual basis[19] and those of its peers by 2.7%.

53. When an investment option's track record is so poor, as is apparent here, Defendants should have necessarily utilized a process that replaced the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, in such an efficient segment of the market, retain an alternative that tracks the benchmark. The Plan offered the VDIGX fund for the duration of the relevant Class Period in the Plan's Core Funds, despite that it aims to beat out the returns its benchmark[20] (which it failed to

---

[19] Vanguard Dividend Growth Fund, Vanguard, https://investor.vanguard.com/investment-products/mutual-funds/profile/vdigx#performance-fees (last visited Feb. 15, 2026).
[20] The primary index changed from NASDAQ US Dividends Achievers Select Index in 2020, to Dividend Growth Spliced Index between 2021-2025.

do), rendering it entirely unnecessary and harmful to participants to retain a persistently underperforming actively managed strategy in the same market segment.

54. Despite transparent and persistent red flags, Defendants failed to appropriately select and/or monitor the VDIGX fund throughout the Class Period and neglected to replace the underachieving investment option, in a severe breach of their fiduciary duty.

55. The Defendants' failure to evaluate and remove VDIGX is even more egregious considering they were sued by plan participants in 2016, and settled in 2019, claims related to underperforming funds *including* VDIGX.[21] Defendants should have been aware of the consistent underperformance of VDIGX and acted swiftly to remedy the damage the this fund's underperformance was having on plan participants and their retirement savings.

## C. Prudent Fiduciaries Would Have Reviewed Alternatives and Replaced the Imprudent Fund

56. The tables shown above (including the benchmark and peer comparisons) represent an ideal group for comparison, as they represent the most likely alternatives to be considered were the Imprudent Fund to be replaced with a similar and better performing product. This is not to suggest each of the peer funds provided above represents a prudent or appropriate replacement without additional evaluation, only that they represent funds with similar strategies and risk profiles and therefore would be used as points of comparison in a prudent fiduciary's evaluation the Imprudent Funds' performance. It bears noting that hundreds of retirement plan fiduciaries select new mutual funds each year, conducting a search is simply not possible without measuring funds with similar and/or different styles, strategies, risk profiles, and asset allocations (discussed in further detail below) against one another.

---

[21] *See Cassell et al. v. Vanderbilt University et al.*, Second Amended Complaint, Case No. 3:16-cv-2086 (M.D. Tenn.) (ECF No. 102) (identifying VDIGX as an underperforming fund).

57.     Prudent fiduciaries are aware of the major offerings in the asset classes represented in a plan. This is all the more important as it relates to the Plan's Core Funds, given the gravitation of the Plan's assets to the Core Funds and importance of the Core Funds to the overall design of the Plan's investment menu. In fact, Defendants could have sought comparative returns data and other metrics for each of the peer funds in real-time throughout the Class Period. When evaluated against the Peer funds (both individually and as a group), the returns of the Imprudent Fund paled in comparison to those of the readily available alternatives and its own benchmark. Accordingly, the analytical frameworks employed by prudent fiduciaries could not have supported a determination that the expected returns of the Imprudent Fund justified their retention in the Plan, let alone the Plan's Core Funds.

58.     The comparative performance data represents information that was accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries. At any point during the Class Period, such data, in addition to the comparative datapoints of the benchmarks and the broad peer universe, would have been sufficient to convince a fiduciary following a prudent process to investigate alternatives and ultimately replace the Imprudent Fund.

59.     VDIGX's persistent underperformance would have rung alarm bells for prudent fiduciaries. The Imprudent Fund's inability to generate returns to beat any measuring stick, including its own custom benchmarks, and specific peers closest to them in strategy and management style, represented overwhelming and consistent evidence that they could not provide superior returns (and were costing the Plan's participants tens of millions of dollars in potential appreciation).

60.     Again, the above information was readily obtainable and computable by the Defendants in real time throughout the relevant period. The Committee, however, neglected to

undertake any analysis of the Imprudent Fund against specific peers using the above or other important performance metrics. That the Imprudent Fund was retained as an investment option in the Plan, including the Plan's Core Funds, in spite of their persistent failure to satisfy any performance standard, peer-relative or against a benchmark, is a transparent indication that Defendants ignored or were otherwise unaware of the deplorable pattern of rolling returns. The Imprudent Fund was not, and is not, an appropriate investment option for the Plan, much less in the role as a Core Fund. If Defendants had taken their fiduciary duties seriously during the Class Period and acted consistently with the minimum fiduciary standards of care, it would have replaced the Imprudent Funds with a suitable alternative. Its failure to do so caused the Plan's participants to miss out on substantial investment returns for their retirement savings.

Plaintiffs did not acquire actual knowledge regarding the breaches at issue here until shortly before filing this Complaint.

## VI.    <u>CLASS ACTION ALLEGATIONS</u>

61.    This Action is brought as a class action by Plaintiffs, on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the Vanderbilt University Medical Center Retirement Plan at any time on or after March 17, 2026, and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just.

62.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' immediate family members; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; Defendants' and Plaintiffs' counsel; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

24

63.     This action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

64.     **Numerosity.** Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this Action is impracticable.

65.     **Commonality.** There are numerous questions of fact and/or law that are common to Plaintiffs and all members of the Class. These include:

(1)     Whether Defendants failed to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(2)     Whether Defendants continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(3)     Whether Defendants breached their fiduciary duties under ERISA by failing to (a) act with the care, skill, and diligence of a prudent person; (b) diversify the investments of the plan so as to minimize the risk of large losses; (c) act in accordance with the documents and instruments governing the Plan; and

(4)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

66.     **Typicality.** Plaintiffs, who are members of the Class, have claims that are typical of all members of the Class. Plaintiffs' claims and all Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories applicable to all Class members. In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable to all Class members

67.     **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible

standards of conduct with respect to the Class as a whole. Defendants' (mis)conduct challenged herein applies to, and effects Class Members uniformly and Plaintiffs' challenges of Defendants' policies, or lack thereof, hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

68.     **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of all Class Members. Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA class actions, and Plaintiffs intend to prosecute this action vigorously.

69.     **Potential Risks and Effects of Separate Actions.** The prosecution of separate actions by individual Class members would create a risk of: (1) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (2) adjudication with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

70.     **Predominance.** Common questions of law and fact predominate over questions affecting only individual Class members, and the Court and the parties will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial act, and which does not bar Class Certification.

71.     **Superiority.** A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority of, if not all, Class members are unaware of

26

Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

72. **Manageability:** This case is well-suited for treatment as a class action and can easily be managed as a class action since evidence of both liability and damages can be adduced and proof of liability and damages can be presented on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

73. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

74. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that thousands, if not tens of thousands, of individual actions, would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

27

Members, who cannot individually afford to litigate a complex claim against Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

75. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

76. Therefore, this Action should be certified as a class action under Rules 23(a), and 23(b)(1) or 23(b)(3) of the Federal Rules of Civil Procedure.

## VII.   CAUSES OF ACTION

### COUNT I –Breaches of Fiduciary Duty Against All Defendants
**(On Behalf of Plaintiffs and the Class)**

77. Plaintiffs incorporate by reference the allegations in the previous paragraphs.

78. At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

79. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

80. During the class period, the Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA

81. At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects by selecting and continuing to retain a severely

28

underperforming Imprudent Fund across peers and its benchmark instead of removing it in favor of better and available options.

82. The Defendants had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's Imprudent Fund was a prudent choice for the Plan.

83. The Defendants had a continuing duty to remove imprudent investment options regardless of how long those investments had been in the Plan.

84. During the Class Period, the Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by failing to engage in a prudent fiduciary process for monitoring the Plan's Imprudent Fund and by failing to remove it within a reasonable period.

85. The Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate the Imprudent Fund against meaningful benchmarks.

86. The Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

87. As a result of the Defendants' breach of its fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

88. The Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting

29

from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### COUNT II – Failure to Monitor Fiduciaries and Co-Fiduciary Breaches Against the Committee and the Board
#### (On behalf of Plaintiff and the Class)

89.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

90.     Defendant VUMC, acting through the Trustee's and/or Board, is responsible for appointing, overseeing, and removing members of the Committee, who, in turn, are responsible for appointing, overseeing, and removing imprudent investments.

91.     In light of its appointment and supervisory authority, VUMC and the Board and/or Trustees had a fiduciary duty to monitor the performance of the Committee and its members. VUMC, the Committee, the Trustees and the Board as a whole also had a fiduciary to monitor the performance of the Imprudent Funds.

92.     A monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those related to the investment and holding of the Plan's assets, and must take prompt and effective action to protect the Plan and its participants when the monitored fiduciaries do not perform their fiduciary obligations.

93.     To the extent that any fiduciary monitoring responsibilities of VUMC, the Committee, the Trustees or the Board were delegated, each Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

94.     VUMC, the Committee, the Trustees and the Board breached their fiduciary monitoring duties by:

(1) Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses

30

due to the appointees' imprudent and disloyal actions and omissions related to the Plan;

(2) Failing to monitor their appointees' fiduciary processes (or lack thereof), which would have alerted a prudent fiduciary to the breaches of fiduciary dudties described herein in clear violation of ERISA; and

(3) Failing to remove appointees whose performances were inadequate in that they continued to maintain unsuitable investments in the Plan, all to the detriment of the Plan and its participants' or beneficiaries' retirement savings.

95. As a consequence of these breaches of fiduciary duties to monitor, the Plan suffered substantial losses. If VUMC, the Committee, the Trustees and/or the Board had discharged their fiduciary monitoring duties prudently, the losses suffered by the Plan would have been avoided or minimized. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants and/or beneficiaries lost millions of dollars in retirement savings.

96. VUMC, the Committee, the Trustees and the Board are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties, to restore to the Plan any profits made through use of the Plan's assets, and are subject to other equitable or remedial relief as appropriate.

97. Each Defendant also knowingly participated in the breaches of fiduciary duties by the other Defendants, knowing that such acts constituted breaches, enabled the other Defendants to commit breaches of fiduciary duties by the other fiduciaries, and failed to make any reasonable effort under the circumstances to remedy those breaches. Defendants are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

31

# PRAYER FOR RELIEF

98.     WHEREFORE, Plaintiffs, on behalf of themselves, the Plan and the Class, pray for judgment against Defendants as follows:

(1)     Declaratory and injunctive relief under Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(2)     Equitable, legal, or remedial relief to return all losses to the Plan and/or for restitution and/or damages as stated above, plus all other equitable or remedial relief as the Court may deem appropriate under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(3)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(4)     Attorneys' fees, costs, and other recoverable expenses of litigation; and

(5)     Such further and additional relief to which the Plan may be entitled and or that the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs seek a jury trial in this matter.

Dated: March 17, 2026

Respectfully submitted,


 */s/Alexandr Rudenco*
Alexandr Rudenco (TN Bar No. 040554)
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

William B. Federman*
Alex J. Ephraim*
**Federman & Sherwood**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560          E:
aje@federmanlaw.com

Don Bivens*
Maxwell K. Weiss*
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450
Email: don@donbivens.com

*Pro Hac Vice Forthcoming*

*Attorneys for the Plaintiffs, the Plan,
and the Proposed Class*

33